# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**KRISTIN TEBO,**                                      )
)
    **Plaintiff,**                              )
)      **Civil Action No.**
    **v.**                                     )      **09-40068-FDS**
)
**SEDGWICK CLAIMS MANAGEMENT**        )
**SERVICES, INC.; PNC FINANCIAL**      )
**SERVICES, INC.; THE PNC FINANCIAL**  )
**SERVICES GROUP, INC.; and**          )
**AFFILIATES LONG TERM DISABILITY**    )
**PLAN,**                              )
)
    **Defendants.**                          )
_____)


## MEMORANDUM AND ORDER ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO STRIKE

**SAYLOR, J.**

    This is a dispute concerning the denial of continued long-term disability benefits. The matter arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, _et seq_. The benefits at issue were provided to plaintiff Kristin Tebo under a disability plan provided to her as part of her employment with defendant PNC Financial Services, Inc. The plan at issue is the PNC Bank Corp. and Affiliates Long Term Disability Plan (the "Plan"). Defendant Sedgwick Management Services, Inc. is the administrator of claims for the Plan.

    Tebo has a variety of eye conditions that resulted, among other things, in surgery in May 2004. She did not return to work until after the surgery. Sedgwick originally determined that she was unable to perform each of the material duties of her regular occupation, and was thus "totally disabled" under the terms of the Plan. Under the terms of the Plan, after 24 months, she could

continue to receive benefits only if she was unable to perform each of the material duties of any gainful occupation for which he or she was reasonably fitted by training, education, or experience. Sedgwick determined that she did not meet the "any occupation" standard of the Plan and formally terminated her benefits. She unsuccessfully appealed the denial within Sedgwick, and now seeks judicial review of the denial.

The parties have cross-moved for summary judgment. Defendants have also moved to strike certain documents conditionally added to the administrative record. For the reasons set forth below, defendants' motion to strike will be denied, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

## I.     Background

Kristin Tebo was employed by PNC Financial Services, Inc., as an Investment Accounting Manager from 2000 to May 19, 2004. (AR at 389). As a full-time employee, she participated in the PNC Bank Corp. and Affiliates Long Term Disability Plan. The Plan is governed by ERISA, and provides full-time, salaried employees with certain disability benefits. (*Id.* at 406, 518). Benefits pursuant to the Plan are paid out of a trust, called the Group Benefits Trust. (*Id.* at 439-74, 518). PNC makes periodic, irrevocable payments to the trust, and all money paid into the trust must be used at all times for the exclusive benefit of Plan participants or beneficiaries. (*Id.* at 470, 518).

PNC is the administrator of the Plan. (*Id.* at 409). The Plan grants the administrator "complete and sole discretion with regard to the [administration of the Plan]," and provides that "no decision of the Administrator shall be overturned unless the decision is arbitrary and capricious." (*Id.* at 421). Under the Plan, PNC has discretion "to appoint or employ individuals

2

or firms to assist in the administration of the Plan and any other agent or agents it deems advisable." (*Id.* at 421). In accordance with that provision, PNC and Sedgwick entered into a Service Agreement that provided, among other things, that Sedgwick would be responsible for determining eligibility of all LTD claims in return for a fixed quarterly fee. (*See Id.* at 496, 498-503).

The Plan provides for the payment of benefits to employees who are "totally disabled." It includes the following definitions:

> "Totally Disabled" and "Total Disability" mean that because of injury or sickness:
> a. The Participant cannot perform each of the material duties of his or her regular occupation; and
> b. After benefits have been paid for 24 months, the Participant cannot perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training, education or experience.

(*Id.* at 410). In other words, a participant in the Plan is entitled to disability benefits for up to 24 months if the administrator determines that she is unable to perform the substantial and material duties of her *own* occupation. After 24 months, she is entitled to benefits if the administrator determines that she is unable to engage in *any* gainful occupation.

Under the terms of the Plan, if the administrator denies a claim, the participant must file a written request for an appeal within 60 days after receipt of a written denial of benefits. (*Id.* at 422).

A.     **Initial Decision Granting Disability Benefits**

Tebo had surgery on her left eye on May 20, 2004. She did not return to work thereafter. (*Id.* at 382-84). At the time of her surgery, she lacked stereoscopic vision, because the vision in her right eye was significantly diminished by a congenital hamartoma (a benign tumor on the optic

nerve).  (*Id.* at 193).  As a result of that condition, she had no practical vision in her right eye. (*Id.*).

Tebo submitted an "Employee Application for Benefits" form on August 16, 2004, seeking long-term disability ("LTD") benefits.  (*Id.* at 377-80).  She listed Dr. Marvin Defrin and Dr. Willard Rice as her treating physicians, and explained that she could only drive in daylight and was unable to read or view a computer without pain.  (*Id.* at 377-78).

On September 24, 2004, Sedgwick sent Dr. Defrin a questionnaire concerning Tebo's disability.  It also requested copies of her medical records from May 19, 2004, "to the present." (*Id.* at 366, 372).  Dr. Defrin completed the questionnaire on October 18, 2004.  He stated that Tebo's vision had not returned to normal and that she had "persistent difficulty with small print and numbers."  (*Id.* at 366).  However, his prognosis was "good" that she would be able to return to work on a full- or part-time basis.  (*Id.*).  A Sedgwick representative also spoke with Tebo on the telephone on September 24, 2004.  (*Id.* at 59).  She stated at the time that she was still healing from the surgery, but believed she would be able to return to work in October.  (*Id.*).

On November 23, 2004, Sedgwick concluded that Tebo's medical conditions prevented her from performing the material duties of her regular occupation and therefore awarded her disability benefits.  (*Id.* at 362-63).  That conclusion was based on its review of the medical records and its communications with Tebo and Dr. Defrin.  Sedgwick advised her that it would periodically verify her ongoing eligibility for benefits, and closely monitor her medical condition, to determine when it would be possible for her to return to work.  (*Id.* at 363).  During that period, Tebo was required to apply for Social Security Disability ("SSD") benefits.  (*Id.* at 363).

Sedgwick regularly monitored Tebo's condition and paid benefits for the full 24 months. (*See id.* at 49-55, 110, 322-23, 333-41). Tebo applied for SSD benefits; on February 24, 2006, the SSA granted her those benefits for the period from May 19, 2004, through July 13, 2005. The SSA concluded, however, that "[o]n July 13, 2005, medical improvement occurred that was related to her ability to work, and [Tebo] has been able to perform substantial gainful activity from that date through the date of this decision." (*Id.* at 313).

**B.     Denial of LTD Benefits**

On March 1, 2006, Sedgwick advised Tebo that beginning on August 18, 2006, she would only receive benefits if it found that she was not able to engage in any gainful occupation. (*Id.* at 270-71). To assist in making that determination, Sedgwick provided her several forms to be completed by her and her attending physician, including an Attending Physician Statement, a Physical Capacities Form, a Claimant's Statement, and a Training, Education and Experience Statement. (*Id.* at 270).

Dr. Defrin completed the "LTD Report of Disability" on March 9, 2006. In that report, he stated that Tebo had reached her maximum level of medical improvement, that she was legally blind in her right eye due to a congenital condition, and that she had 20/25 vision in her left eye. (*Id.* at 256-58). On March 22, 2006, Tebo completed the Training, Education and Experience form, in which she outlined her education and work experience. She also indicated that her condition had not changed since July 2005, and that she had been awarded a closed period of SSD benefits. (*Id.* at 266-68).

Sedgwick received a copy of the full SSA decision on April 7, 2006. (*Id.* at 276-78). After reviewing the decision, it decided to ask Dr. Defrin to confirm Tebo's current restrictions

and limitations and indicated it may need to conduct a Transferable Skills Analysis ("TSA") to determine whether she could perform any alternative occupations. (*Id.* at 45-47). Sedgwick also received additional medical records from Dr. Defrin outlining his treatment. (*See id.* at 325-26, 336-41).

On August 15, 2006, Sedgwick informed Tebo that her disability benefits would be suspended effective August 18, 2006, "based on a lack of current treatment information on file supportive of continuing total disability." It asked for all medical documentation supporting her LTD claim by September 5, 2006. (*Id.* at 251-53). Sedgwick also sent Dr. Defrin a letter requesting additional information, including a request for medical records after October 1, 2005. (*Id.* at 250, 254). Dr. Defrin responded that Tebo had no depth perception, poor night vision, and was unable to read for more than 10 minutes. (*Id.* at 250). Thus, according to Dr. Defrin, she was unable to perform any work requiring extended reading, binocular vision, or working at night. (*Id.*). Dr. Defrin's prognosis as to whether she would be able to return to gainful full- or part-time employment was "guarded." (*Id.*). He did not provide any additional medical records. (*Id.*).

On September 26, 2006, Sedgwick requested a peer review of Tebo's medical records from Medical Consultants Network, Inc. (*Id.* at 248-49). The request specifically asked for "the objective findings to support" a finding that Tebo was legally blind, and "the objective evidence to support loss of visual acuity, depth perception, accommodation, and binocular vision." (*Id.* at 248). Dr. William B. Baer, an ophthalmologist, conducted the review; he completed his report on September 27, 2006. (*Id.* at 235-38). In conducting his review, Dr. Baer considered the medical records and spoke with Dr. Defrin. (*Id.*). Dr. Baer noted that Tebo "has never had stereopsis"

because her "right eye has had very limited acuity all her life." (*Id.* at 237). He concluded that "it appears that the patient does not have restrictions and limitations which would preclude her from performing work activity," and that "she should be able to return to work activities without substantial limitation or impairment." (*Id.* at 237). He also noted that "[h]er complaints are subjective and include fatigue and intermittent blurring of vision," but that "these could be dealt with by choosing an appropriate work environment and the use of appropriate vision aids with the computer screen and in other activities." (*Id.*).

After Dr. Baer issued his findings, Sedgwick received additional information from Dr. Willard G. Rice. (*Id.* at 241-45). Dr. Rice reported that he had examined Tebo on November 8, 2004, and February 14, 2005. He stated that the vision in her good eye was correctable to 20/25, but noted that she had commented that her night vision was poor and fatigued easily when reading for a short period of time. (*Id.* at 242). Dr. Rice concluded that she could not read small print, work on a computer, conduct hand-eye coordination tasks, or identify details at close range. (*Id.* at 243). On October 31, 2006, Dr. Baer submitted an addendum to his report taking into account the additional information from Dr. Rice. (*Id.* at 232-33). He concluded that the "records add nothing of a factual nature which was not previously recorded in the chart material sent me and do not change my opinion in any way." (*Id.* at 232).

On November 30, 2006, Sedgwick examiner Stephanie L. Jackson requested a TSA to determine if there were any alternative occupations that Tebo could perform. (*Id.* at 21-22). She also requested a clarification of the type of visual aids and the type of appropriate work environment Tebo needed, as mentioned in Dr. Baer's report. (*Id.* at 21). Jackson stated that "[t]his should be obtain[ed] prior to TSA referral" in order to assist the TSA determination and

7

because, depending on the nature of the accommodations, a Labor Market Survey ("LMS") might be warranted. (*Id.* at 21-22).[1]

Karen Taussig, an independent vocational expert, conducted the TSA on January 20, 2007. (*Id.* at 218-21, 226-29). Her report indicated that she considered Tebo's Training, Education, and Experience Statement; the Investment Manager III job description; and Dr. Baer's report. (*Id.* at 220, 228). Tanssig's report also referred to Tebo's subjective complaints of workplace fatigue. (*Id.* at 218-21, 226-29). Taussig identified job title matches in the Dictionary of Occupational Titles from the Department of Labor based on Tebo's work history. (*Id.*). Ultimately, Tanssig reported that there were 45 possible occupations for which she was qualified. (*Id.* at 220-21, 228-29).

On February 28, 2007, Sedgwick terminated Tebo's LTD benefits. Sedgwick based that decision on a review of Tebo's medical records, Dr. Baer's report, and the TSA conducted by Taussig. The termination letter stated that "there is no medical evidence to support total disability from any occupation on a full-time basis." (*Id.* at 110-14). It also stated that if Tebo disagreed with that determination, she had to submit a written appeal, which Sedgwick had to receive within 180 days of her receipt of the denial letter. (*Id.* at 113). It also explained that if Tebo appealed, she would "have the opportunity to submit written comments, documents, or other information in support of [her] appeal," and that "[t]he review will take into account all new information, whether or not presented or available at the initial determination." (*Id.*).

---

[1] According to the Sedgwick training materials, an LMS is used to "indicate whether the occupations listed exist in the employee's Labor Market," and will "indicate whether the job can be performed within the employee's restrictions." (*See* Pl. Mot. to Supplement AR, Ex. D).

## C.    Appeal of Termination Decision

On August 21, 2007, Tebo appealed Sedgwick's decision.  (*Id.* at 13, 120-21).  The

appeal letter included an affidavit by Tebo and an August 9, 2007 report by Dr. Arnold Zide, an

ophthalmologist.  (*Id.* at 122-26).  On September 11, 2007, Tebo provided Sedgwick seven

additional medical records from Dr. Defrin.  (*Id.* at 191-200).

In her affidavit, Tebo detailed her medical history, stating that she first developed

problems with her right eye in 1996, and that she regained favorable vision following cataract

surgery that year.  (*Id.* at 122).  According to the affidavit, Dr. Rice identified clouding in her

right eye in 2000, and she underwent a YAG laser capsulotomy to correct the problem.  (*Id.*).

The procedure, however, was unsuccessful, and she lost functional vision in her right eye in

September 2000.  (*Id.*).  The affidavit also set forth her subjective complaints, including the

inability to read consistently for more than five minutes or in low light; to perform any task that

requires close vision or concentrating on a computer screen or device for a prolonged period; and

to drive at night or in rain or snow.  (*Id.* at 123).

Dr. Zide's report stated that he met with Tebo on July 20, 2007.  The report described her

vision complaints, the extent of her vision loss, and her workplace symptoms.  (*Id.* at 125).  He

concluded that she "is unable to maintain consist[e]nt focus for any length of time past a few

minutes in this office.  Th[e]refore, I doubt tha[t] she could maintain a position that requires

constant visual use."  (*Id.* at 126).

Sedgwick referred Tebo's claim to Insurance Appeals, Ltd., for another independent peer

review.  (*Id.* at 186).  Dr. George M. Yanik, Jr., an ophthalmologist, conducted the review.  (*Id.*

at 173-78).  Dr. Yanik reviewed all of the medical records submitted to support Tebo's initial

LTD claim, as well as the information she submitted in support of her appeal. (*Id.* at 187-90). He also spoke with Dr. Rice and Dr. Zide and attempted to speak with Dr. Defrin. (*Id.* at 173-74). He completed his report on September 25, 2007.

Dr. Rice reported that Tebo's night vision was poor, and that she had a reading acuity of 20/25 and no visual field defects. (*Id.* at 173). Dr. Yanik asked him if he thought she was disabled, but Dr. Rice did not answer directly; instead, he stated that there may be a psychological overlay of depression affecting her, and that her long-term outlook was guarded and would require long-term monitoring. (*Id.*). Dr. Zide reported that in his last examination of Tebo, her visual acuity was 20/30 in her left eye, and that she had a subjective problem with distant visual acuity that made it difficult for her to see. (*Id.* at 174). He stated that her visual acuity may get worse and that there was no apparent deficit in her peripheral vision in her left eye. (*Id.*).

Dr. Yanik concluded that Tebo's visual acuity was 20/25 and that she was not totally disabled from all occupations from August 18, 2006, through the time of his review. (*Id.* at 175). He stated that "Tebo's visual acuity in her right eye has been severely diminished since early childhood" and that she "never had a chance to develop stereoscopic vision." (*Id.* at 177). He also reasoned that although "Tebo does have subjective clinical complaints, there are no objective findings in the medical record that would be applicable either to the AMA or to Social Security Guidelines for visual disability." (*Id.*). He stated that Tebo's "subjective clinical complaints[,] though important, do not rise to the level at which one would consider complete visual disability based upon those aforementioned guidelines." (*Id.*). Dr. Yanik also considered Dr. Baer's report and stated that his conclusions coincided with Dr. Baer's. (*Id.*).

On October 3, 2007, Sedgwick made a final determination that Tebo was not eligible for

disability benefits after August 17, 2006. (*Id.* at 77-79). The denial letter referred to the additional medical records submitted in support of her appeal and Dr. Yanik's report. (*Id.*). After providing an overview of the additional medical evidence and Dr. Yanik's report, the letter concluded that "[a]lthough some findings were referenced, none were documented to be so severe as to restrict, limit or otherwise completely prevent Ms. Tebo from performing the essential functions of any occupation for which she may be qualified by education, training or experience from August 18, 2006 through her full-time return to work." (*Id.*).

### D. Procedural Background

On April 2, 2009, Tebo filed a complaint in this Court against PNC and Sedgwick challenging the 2007 final determination, contending that the decision was arbitrary and capricious. This Court granted plaintiff's motion for limited pre-trial discovery. She later moved to supplement the administrative record with six pages of documents Sedgwick uses to train new claim administrators. This Court conditionally granted the motion to supplement the administrative record without prejudice to Sedgwick's ability to file a motion to strike the documents.

Both parties have cross-moved for summary judgment. In addition, defendants moved to strike the six pages of training material conditionally added to the administrative record as well as various factual averments in her statement of undisputed facts.

## II. Defendants' Motion to Strike

In an earlier memorandum and order, this Court granted plaintiff limited pre-trial discovery but withheld judgment as to whether the administrative record should be supplemented until after discovery was completed. Defendants subsequently produced 219 pages of additional

documents, consisting primarily of training documents. Plaintiff then moved to supplement the administrative record with six pages from those documents. This Court conditionally granted the motion to supplement the administrative record without prejudice to defendant's ability to file a motion to strike the documents. Defendants have now so moved.[2]

An administrator's internal guidelines and training materials are admissible and may be added to the administrative record when they are relevant to determining whether the administrator's decision was arbitrary or capricious. *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 122-23 (1st Cir. 2004); *see also Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 25 (1st Cir. 2003) (reasoning that "[w]hether discovery was warranted depends in part on if and in what respect" it is "substantively relevant to the question whether the administrator's construction and application of the plan . . . was reasonable").[3] "[T]he weight and admissibility of internal documents . . . will vary with the facts of each case." *Glista*, 378 F.3d at

---

[2] Defendants have also moved to strike various factual averments in plaintiff's summary judgment papers not related to the additional discovery. While a statement of material facts may assist the Court, in deciding a motion for summary judgment, the Court does not rely upon the parties' characterization of the facts, but considers the facts as they exist in the administrative record. *See Western Sea Fishing Co., Inc. v. Locke*, 722 F. Supp. 2d 126, 130 n.2 (D. Mass. 2010) ("The statement of material facts serves the purpose of directing the Court to 'what is—and what is not—genuinely controverted' in [the] administrative record." (quoting *Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir. 2006)); Fed. R. Civ. P. 56(c)(3) ("The court *need consider* only the cited materials, but it *may consider* other materials in the record." (emphasis added)). In any event, the Court does not need to reach its merits as granting such a motion would not change the result in this case.

[3] Such documents are potentially relevant to an ERISA claim because

what is sought to be admitted are the plan administrator's own documents interpreting the language of the Plan and providing the standard for evaluation of the facts presented. The documents here are more analogous to an administrative agency's guidelines or regulations, which are routinely considered in evaluating whether the agency's actions were arbitrary or capricious. The documents here shed light on the "legal" rule the Plan applies, not the underlying facts presented to the Administrator.

*Glista,* 378 F.3d at 122-23.

123. In particular, "[s]uch documents are most likely to be relevant where they have been authenticated, have been generated or adopted by the plan administrator, concern the policy in question, are timely to the issue in the case, are consistently used, and were known or should have been known by those who made the decision to deny the claim." *Id.*

Here, the training documents were produced by Sedgwick, and there is no issue as to their authenticity. They were either generated by Sedgwick itself, or adopted by it in the course of training of its employees. They were in use during the relevant time, and thus are timely to the issues in the case. They were also consistently used to train newly hired examiners and were made generally available to all claim examiners.

In short, the training materials, at least to some degree, reflect Sedgwick's interpretation of its obligations under the Plan at the time it evaluated plaintiff's claim, and thus are relevant. *See id.* at 125. The Court will therefore deny the motion to strike. The Court, however, will not give the training materials undue weight, "because it is not clear that the decisionmakers in [plaintiff's] case knew or should have known of the Training Materials when evaluating [her] claim." *Id.* While the training materials were generally available, they were primarily provided to examiners with no prior experience determining LTD claims. The claim examiners working on plaintiff's claim were not new examiners. Furthermore, while it is a fair assumption that Sedgwick's decision-makers were or should have been familiar with the company's internal guidelines, and possibly its training materials, there is no evidence that they were, or should have been, provided with these specific training documents in evaluating plaintiff's claim.

For the foregoing reasons, defendants' motion to strike will be denied.

### III.     Cross-Motions for Summary Judgment

## A.  Standard of Review

"In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002).  That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan administrator has been granted such discretion, its decision must be upheld unless "arbitrary, capricious or an abuse of discretion."  *Diaz v. Seafarer's Int'l Union*, 13 F.3d 454, 456 (1st Cir. 1994).  Where the plan administrator properly delegates its discretionary authority to a third party, the third party's decisions are also reviewed for abuse of discretion.  *Terry v. Bayer Corp.*, 145 F.3d 28, 36, 37-38 (1st Cir. 1998) (citing *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir. 1993)).

The parties do not dispute that the Plan grants the administrator discretion to determine eligibility.[4]  The parties disagree, however, as to whether the administrator properly delegated its discretion to Sedgwick.  "ERISA allows named fiduciaries to delegate responsibilities (other than trustee responsibilities) through express procedures provided in the plan."  *Rodriguez-Abreu*, 986 F.2d at 584 (citing 29 U.S.C. § 1105(c)(1)).  The Plan need not set out a detailed list of delegation procedures; rather, it need only contain "a grant of authority to delegate, together with any limitations that might exist on any such grant or the method of making it."  *Wallace v.*

---

[4] The Plan explicitly states: "The Administrator shall have complete and sole discretion with regard to the [administration of the Plan] and no decision of the Administrator shall be overturned unless the decision is arbitrary and capricious."  (AR at 421).

14

*Johnson & Johnson*, 585 F.3d 11, 15 (1st Cir. 2009). There must be evidence that the administrator actually delegated its discretionary authority; "inferences from the circumstances [are] insufficient to prove delegation of discretionary authority." *Rodriguez-Abreu*, 986 F.2d at 584.

Plaintiff's primary contention is that the Plan does not expressly permit PNC to delegate its discretionary authority to Sedgwick, but only allows PNC to retain firms like Sedgwick to "assist" with plan administration. (Pl. Reply Mem. Opp. at 2-3). Specifically, the language of the Plan gives the administrator "complete and sole discretion" to decide claims for benefits and allows the administrator "to appoint or employ individuals or firms to assist in the administration of the Plan and any other agent or agents it deems advisable." (AR at 421). Plaintiff correctly points out that the Plan does not explicitly use the term "delegate." But the Plan clearly authorizes the administrator to appoint agents to assist in the exercise of its discretionary authority "in the administration of the Plan." Even if not stated explicitly, such an appointment would require that the administrator delegate at least part of its discretionary authority to the appointed agent. *See Terry*, 145 F.3d at 36, 37-38 (holding that plan language that did not explicitly use the term "delegate" nonetheless authorized delegation where the agent was "designated to 'act on behalf of the Corporation by assisting the Corporation in fulfilling its administrative duties . . . .'"); *see also Connor v. Sedgwick Claims Mgmt. Servs., Inc.*, 2011 WL 2532463, at *8-*9 (D.N.J. June 24, 2011) (holding that identical language in plan, SPD, and service agreement delegated PNG's discretionary authority to Sedgwick, subject to review under arbitrary and capricious standard); *Babish v. Sedgwick Claims Mgmt. Servs., Inc.*, 2009 WL 563951, at *9 (W.D. Pa. Mar. 2, 2009) (same); *Cloud v. PNC Fin. Servs. Grp., Inc.*, 2009 WL

255631, at *1-*2 (E.D. Pa. Jan. 30, 2009) (same).[5]  Furthermore, the Court can consider the

Summary Plan Description ("SPD") when interpreting the meaning of Plan documents.  *See*

*Bonanno v. Blue Cross & Blue Shield of Mass., Inc.*, 2011 WL 4899902, at *7 & n.4 (D. Mass.

Oct. 14, 2011) (considering SPD to find that plan delegated discretionary to agent); *cf.*

*DiGregorio v. Pricewaterhouse Coopers Long Term Disability Plan*, 2004 WL 1774566, at

*11-*13 & n.13  (D. Mass. Aug. 9, 2004).  Here, the SPD reflects this understanding of the Plan

by expressly stating that "[t]he Plan Administrator may delegate duties involved in the

administration of this Plan" to third parties.  (AR at 437).[6]

The Service Agreement explicitly delegated PNC's discretionary authority to Sedgwick by

providing that Sedgwick was, among other things, responsible for determining eligibility for all

long-term disability claims.  (*See* AR at 498); *Terry*, 145 F.3d at 38 ("No inferences need be

drawn where we discern a clear and direct delegation-by written instrument-from the Plan

Administrator to the Benefit Committee."); *see also Babish*, 2009 WL 563951, at *9.  Thus,

Sedgwick's decision to deny plaintiff's benefits is entitled to deferential review.

Under this standard, the Court must decide "whether the aggregate evidence . . . could

support a rational determination that the plan administrator acted arbitrarily in denying the claim

for benefits."  *Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74 (1st Cir.

---

[5] In fact, plaintiff concedes in her memorandum supporting her motion for summary judgment that "the plan documents gave PNC the ability to delegate claim investigation to Sedgwick."  (Pl. Mem. Supp. at 3 n.1).

[6] Plaintiff contends that the because the SPD reserves  "the ultimate responsibility for the administration of [the] Plan and the authority and discretion to interpret [the] Plan" to PNC, PNC cannot delegate its discretionary authority to Sedgwick.  (*See* AR at 437).  However, the fact that PNC retains responsibility for the Plan's administration and the discretion to interpret it does not mean that it did not delegate to Sedgwick the discretionary authority to determine whether an employee has met *eligibility* for benefits according to its interpretation.  (*See id.* at 498 (Service agreement clause explaining that Sedgwick "will be responsible for claims administration for any employee applying for LTD benefits" and "for determination of eligibility for benefit on all LTD claims")).

2005) (quotation omitted).  The Court will uphold the administrator's decision if it was "reasoned and supported by substantial evidence." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir.2004).  "Evidence is substantial when it is reasonably sufficient to support a conclusion." *Wright*, 402 F.3d at 74 (quotation omitted).  "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Id.*  Because the Court sits essentially as an appellate tribunal, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) (quoting *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005)).

### B.    Conflict of Interest

Plaintiff contends that the Court must give defendant's decision extra scrutiny, within the abuse-of-discretion standard of review, because PNC both administers the long-term disability plan and pays benefits under the plan.  *See Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 5 (1st Cir. 2009) (noting "structural conflict [of interest]" where same party administers and pays benefits under plan).  Where such a structural conflict of interest exists, the Court is required to apply the abuse-of-discretion standard, but must take note of the structural conflict and of any other circumstances that affect the likelihood that the benefits decision may have been biased.  *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-17 (2008).  Such "other circumstances" may include a history of biased claims administration.  *Id.* at 117.  The Court is to consider such factors as tie-breakers; if all other relevant considerations weigh evenly, and if the determination as to whether the plan administrator abused its discretion is very close, the structural conflict of

interest or the administrator's history of biased claims decisions may tip the balance in the plaintiff's favor. *Id.* at 116-17. However, the Court should give such a structural conflict less weight (or perhaps no weight at all) if the plan administrator has implemented appropriate procedures that help remove the potential for bias and promote accuracy. *See id.* at 117.

Defendants contend that there is no structural conflict of interest because Sedgwick, not PNC, determined plaintiff's LTD eligibility, and the Plan is fully self-funded through a separate trust. However, although PNC delegated some of its discretionary authority to administer the plan to Sedgwick, PNC retained "the ultimate responsibility for the administration of th[e] Plan and the authority and discretion to interpret th[e] Plan." (AR at 437). Thus, although PNC did not make the actual determination in this case, it still administers the LTD Plan.

Furthermore, the fact that the Plan's benefits were paid out of a trust, funded by monthly payments made by PNC, does not necessarily eliminate the *existence* of a structural conflict of interest, but should be considered in evaluating the *significance* of the conflict in the administration of the Plan. *Cf. Glenn*, 554 U.S. at 115.

As the Supreme Court explained in *Glenn*, the functional conflict involved when an employer both directly funds and administers a benefits plan, is that "[i]n such a circumstance, 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'" *Glenn*, 554 U.S. at 112. In such a circumstance, "[t]he employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Id.* While less direct, when benefits are paid out of a trust that is funded by monthly payments by the employer, every dollar paid in benefits could result in the employer making increased monthly payments. *Burke v. Pitney*

*Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1026 (9th Cir. 2008). Although this

presents "a less significant conflict compared to plans with benefits paid directly by employers, a

structural conflict of interest does exist." *Id.*

Defendant cites a number of district court cases from other circuits rejecting similar claims

of conflict of interest involving the same Plan at issue in this case. (Def. Mem. Opp. at 6).[7] Each

of those cases rely on pre-*Glenn* precedent from other circuits to conclude that there was no

conflict of interest due to the use of a trust to pay Plan benefits. *Ketterman v. Affiliates*

*Long-Term Disability Plan*, 2009 WL 3055309, at *12 (W.D. Pa. Sep. 21, 2009); *Babish v.*

*Sedgwick Claims Mgmt. Servs., Inc.*, 2009 WL 563951, at *11 (W.D. Pa. Mar. 2, 2009); *Cloud v.*

*PNC Fin. Servs. Group, Inc.*, 2009 WL 255631, at *2 (E.D. Pa. Jan. 30, 2009); *Teel v. Sedgwick*

*Claim Mgmt. Servs., Inc.*, 3:07-cv-00184-THM-DW, Docket No. 25, at 10 (W.D. Ky. Jan. 28,

2008) (citing *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 383-84 (3d Cir. 2000);

*Turner v. Delta Family-Care Disability and Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir.

2002); *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997); *De Nobel v. Vitro*

*Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989)).

The First Circuit has not directly considered the issue of whether making plan payments

_____

[7] Defendant cites one case from the District of Massachusetts holding that there was no conflict of interest where plan payments were made out of a trust. *See Gross v. Federal Exp. Corp. Long Term Disability Plan*, 707 F. Supp.2d 67, 69-71 (D. Mass. 2010). The court in *Gross* relied on pre-*Glenn* and pre-*Denmark* precedent to characterize its inquiry as determining whether "there is an *improper motivation* amounting to a conflict of interest." *Id.* (emphasis added). However, the First Circuit has explained that an absence of improper motivation simply means there was no *actual* conflict of interest, and does not address the question of whether there was a *structural* conflict. *See Denmark v. Liberty Life Assur. Co. of Boston*, 566 F.3d 1, 7 (1st Cir. 2009). Thus, as made clear in *Glenn*, the lack of improper motivation does not settle the matter. It is possible that no *actual* conflict exists despite the existence of a *structural* conflict, where there is no evidence of biased administration of the Plan and there are procedural safeguards that "reduce potential bias and to promote accuracy." *Glenn*, 554 U.S. at 117.

through a trust eliminates the existence of a conflict of interest. However, the Circuit's detailed examination of the effect *Glenn* had on existing precedent provides a useful guidepost. Prior to *Glenn*, the First Circuit had reasoned that the existence of a *potential* conflict—such as when an entity acts both as insurer and plan administrator—can be mitigated by market forces that provide competing incentives to grant claims. *See, e.g.*, *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d 415, 418 (1st Cir. 2000) (citing *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181 (1st Cir. 1998)). It also reasoned that even when a potential conflict exists, a lack of circumstances that indicate improper motivation allow a finding that there was no *actual* conflict that unreasonably that affected the administrator's decision. *See Pari-Fasano*, 230 F.3d at 418-19. After *Glenn*, the First Circuit interpreted this approach as generally consistent with *Glenn*, explaining that "[w]hen *Pari-Fasano* speaks of the potential for conflict, we understand that usage as a reference to the existence of a structural conflict, and not the possibility of finding an actual conflict or 'improper motivation,'" with the caveat that "the market forces rationale *no longer allows a reviewing court to disregard a structural conflict without further analysis.*" *Denmark*, 566 F.3d at 7, 9 (emphasis added).

Thus, after *Glenn*, "structural conflicts [must] be accorded weight—albeit not necessarily dispositive weight—in the standard-of-review equation." *Id.* at 9. Only *after* recognizing the existence of a structural conflict must the court "inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." *Id.*

Here, while the use of a trust to make plan payments does decrease the effect any potential conflict of interest may have on the administrator's decision, this Court finds that it is more

consistent with the rationale of *Glenn* to conclude that the existence and nature of a trust does not affect "the *existence* of a conflict;" rather, it affects the "*significance* or *severity* " of a conflict. *Cf. Glenn*, 554 U.S. at 115. *See Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 52-53 (W.D. Pa. 2011) (finding structural conflict because "PNC both funds the Plan and serves as the Plan Administrator," but finding conflict to be of "minimal importance" because PNC took active steps to reduce potential bias by "providing Sedgwick with sufficient funds to cover LTD claims, and . . . expressly reliev[ing Sedgwick] of the obligation to advance its own funds to cover such claims"). The Court therefore concludes that although Plan benefits were paid from a trust funded by PNC, there was a structural conflict of interest that must be taken into consideration.

Having determined the existence of a structural conflict, the Court must next determine how much weight to give that conflict in reviewing the decision to deny plaintiff's benefits. Plaintiff does not allege that defendants have a history of biased claims administration, or that they were biased in this case or acted with any improper motivation. *See Glenn*, 554 U.S. at 116-17. Thus, the question is how much weight, if any, to give the conflict in light of any procedures designed to remove the potential for bias and promote accuracy of claims administration. *See id.* at 117.

Here, there were significant procedural safeguards to promote the fair administration of the Plan. PNC makes periodic irrevocable payments to the trust. (AR at 518). All payments are made from the trust. (*Id.*). The payment amounts are determined by an independent actuary based on calculations and projections of PNC's future LTD liability. (*Id.*). PNC holds no residual interest in the assets of the trust; rather, all monies in the trust must be used at all times for the

exclusive benefit of participants or beneficiaries. (*Id.*; *see also* AR 470 (in the event that the Plan terminates, any trust funds remaining after all benefits are paid "shall be applied to provide, either directly or through the purchase of insurance, additional benefits"). Furthermore, although PNC has a financial interest in Sedgwick's performance in adjudicating claims under the Plan, Sedgwick is paid a fixed quarterly administration fee. (AR at 496). In other words, Sedgwick is paid the same amount regardless of whether it decides to grant or deny benefits.[8]

Thus, despite the existence of a structural conflict of interest, there are significant safeguards designed to decrease the likelihood that the Plan will be administered in a biased manner. However, PNC still has a financial stake in the administration of the Plan, and retains "the ultimate responsibility for the administration of th[e] Plan," (AR at 437), as well as the "the sole duty and responsibility for the determination of the accuracy or sufficiency of the contributions to be made [to the GBT] under the Plan." (AR at 443). Therefore, these procedural safeguards do not minimize the structural conflict "to the vanishing point." *See Glenn*, 554 U.S. at 117. But while the structural conflict will remain a factor weighing in favor of plaintiff's position, in light of the procedural safeguards in place, it is of minimal importance to this Court's analysis. *See id.*

The Court will therefore apply the abuse-of-discretion standard of review, giving weight to the structural conflict if all other relevant considerations weigh evenly, and overturn

---

[8] Plaintiff cites an addendum to the service agreement between Sedgwick and PNC that increased the annual fixed administration fee from $344,199 to $408,000. (AR at 496, 512). However, plaintiff does not argue or point to any evidence in the administrative record that indicates that the fee increase was related to how Sedgwick adjudicated claims under the Plan. Thus, while this is relevant in determining the sufficiency of the procedural safeguards in mitigating the structural conflict of interest, there is no evidence to indicate that this fee increase indicates the existence of an actual conflict of interest. *See Glenn*, 554 U.S. at 116-17.

defendant's decision only if "it is unreasonable, or arbitrary and capricious." *See Pollini v. Raytheon Disability Empl. Trust*, 54 F. Supp. 2d 54, 58 (D. Mass. 1999); *see also Glenn*, 554 U.S. at 116-17.

### C.    Timeliness of Appeal

Before addressing the merits of plaintiff's claims, defendants contend that plaintiff's claim is barred because she failed to file a timely appeal of Sedgwick's denial of her LTD claim. The Plan itself requires that plaintiff submit her appeal within 60 days from the date she received her denial of LTD benefits. (AR at 422). Plaintiff submitted her appeal 174 days after she received Sedgwick's denial letter. However, ERISA requires that employment benefit plans "[p]rovide claimants at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination." 29 C.F.R. § 2560.503-1(h)(3)(i). The letter denying plaintiff's benefits, consistent with ERISA, stated that plaintiff could submit a written appeal and that "[t]his appeal must be received by us within 180 days of the date you receive this letter." (AR at 170). Plaintiff submitted her appeal within the 180 days required by ERISA and defendants' letter denying her benefits. Therefore, plaintiff's appeal was not time-barred.

In any event, even if, as defendants contend, the timeliness of plaintiff's appeal should be evaluated under the terms of the Plan, her claim would not be time-barred. ERISA requires that plaintiff be notified, in writing, of the "specific reasons for [the] denial [of her claims]." 29 U.S.C. § 1133(1). Defendants notified plaintiff in writing, but did not rely upon or even mention the timeliness issue in denying plaintiff's appeal. (AR at 164-66). The Court may only consider "those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Quinlisk v. Unum Life Ins. Co.*, 2009 WL 6506884, at *10 (D. Mass. Sep. 29,

2009) (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007)). Defendants cannot raise the timeliness argument for the first time at this stage of the proceedings as a *post hoc* rationalization of its denial of plaintiff's benefits. *See Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 130-131 (1st Cir. 2004); *Quinlisk*, 2009 WL 6506884, at *10 (D. Mass. Sep. 29, 2009) ("A post hoc attempt to furnish a rationale for a denial of . . . benefits . . . is not acceptable." (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685 (7th Cir.1992)); *cf. Terry v. Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998) (upholding denial of benefits on timeliness grounds where lack of timely appeal was stated reason for denial). It would be problematic, to say the least, to "recognize an administrator's discretion to interpret a plan by applying a deferential 'arbitrary and capricious' standard of review, yet . . . allow the administrator to 'shore up' a decision after-the-fact by [providing] the 'true' basis for the decision after the matter is in litigation." *Ketterman v. Affiliates Long-Term Disability Plan*, 2009 WL 3055309, at *10-*11 (W.D. Pa. Sep. 21, 2009) (quoting *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 177 n.8 (3d Cir. 2001)).

Plaintiff's appeal was therefore timely, and this Court will consider her claim on the merits.

### D.    Analysis

#### 1.    Sedgwick Complied with the "Full and Fair Review" Provision of ERISA

As an initial matter, plaintiff alleges that defendants failed to comply with the "full and fair review" provisions of ERISA by not providing her with the information necessary for her to perfect her claim. Under ERISA, an administrator must "provide adequate notice in writing to

any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). An aggrieved claimant is entitled to a full and fair review of the administrator's decision. *Id.* § 1133(2). The interpretive regulations specifically require that the notice contain (1) the specific reason or reasons for the denial; (2) a reference to the specific plan provisions on which the denial is based; (3) a description of any additional material or information necessary for plaintiff to perfect her claim; and (4) a description of the Plan's review procedures. 29 C.F.R. § 2560.503-1(g)(1)(i)-(iv); *see also Terry*, 145 F.3d at 39.

"ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures"; rather, the beneficiary need only be "'supplied with a statement of reasons that, under the circumstances of the case, permit[] a sufficiently clear understanding of the administrator's position to permit effective review.'" *Terry*, 145 F.3d at 39 (quoting *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994)); *accord Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 113 (1st Cir. 2002). Thus, to obtain relief because of the inadequacy of formal notice, a plaintiff must make a showing "that a precisely correct form of notice would have made a difference." *Id.* (quoting *Recupero v. New England Tel. and Tel. Co.*, 118 F.3d 820, 840 (1st Cir. 1998)); *DiGregorio v. Hartford Comprehensive Emp. Ben. Serv. Co.*, 423 F.3d 6, 16 (1st Cir. 2005).

The record indicates that plaintiff here was "permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Terry*, 145 F.3d at 39. Defendants' denial letters referred to the Plan provisions defining total disability, and set forth the specific reasons and evidence in the record upon which they based their denial of plaintiff's claim.

Specifically, defendants concluded that "there is no medical evidence to support total disability form any occupation on a full-time basis." (AR at 170). The denial letter then stated that plaintiff could "submit written comments, documents, or other information in support of [her] appeal," and detailed the appellate procedures and deadlines. (*Id.*). In response, plaintiff submitted additional medical records from Dr. Defrin and Dr. Zide, and an affidavit explaining her subjective symptoms and medical history. After plaintiff submitted these documents, defendants contacted plaintiff's counsel to make sure she had submitted all additional documentation in support of her appeal and that she understood the appeals process. (AR at 10, 201). Thus, the record indicates that defendants had made clear their position that plaintiff needed to provide medical evidence that demonstrated that she could not perform workplace activities.

Finally, plaintiff has not shown prejudice—that is, she "has not presented any evidence that implies that a different outcome would have resulted had the notice been in formal compliance with the regulations." *Terry*, 145 F.3d at 39. Plaintiff has not shown that defendants's alleged failure to provide the information necessary for her to perfect her claim led her to present different evidence, or otherwise act of fail to act, in a way that would have affected Sedgwick's conclusion. *See DiGregorio*, 423 F.3d at 16. Thus, while plaintiff contends that defendants were required to provide a more detailed description of the specific type of medical records required to perfect her claim, in light of the record in this case, defendants provided her sufficient notice to permit effective review of her claim. *See Terry*, 145 F.3d at 39 (finding that defendant complied with "full and fair review" requirement where plaintiff was directed to forward "any information which may affect the decision to terminate your claim").

## 2. Sedgwick's Decision Was Not Arbitrary and Capricious

Plaintiff contends that Sedgwick's decision to terminate her benefits was arbitrary, capricious, and an abuse of discretion because (1) Sedgwick impermissibly concluded that she was not disabled because she could work with accommodations; (2) Sedgwick failed to investigate the type of accommodations that she would need to return to gainful employment before determining what other occupations she could perform; and (3) Sedgwick acted unreasonably by relying on medical peer reviews.[9]  The Court will consider each of these arguments in turn.

### a.     Consideration of Workplace Accommodations

Plaintiff first contends that defendants acted unreasonably by concluding that she was not disabled because she could return to work with "reasonable accommodations," and the Plan does not permit such a finding.  The relevant part of the Plan states that "total disability" occurs when the "[p]articipant cannot perform each of the material duties of any gainful occupation for which he or she is reasonably fitted by training, education or experience."  (AR at 410).  Plaintiff contends that because (1) Sedgwick's finding that she was not disabled depended upon the existence of appropriate workplace accommodations, and (2) the Plan does not refer to "accommodations" in its definition of "disability," its decision is *per se* arbitrary and capricious.

As an initial matter, the record does not support plaintiff's contention that Sedgwick *relied* on the availability of reasonable accommodations in finding that she was not totally disabled under the Plan.  Neither Dr. Baer nor Dr. Yanik conditioned their conclusion that plaintiff could

---

[9] Plaintiff also contends that defendants breached a fiduciary duty they owed to her under ERISA. Although ERISA authorizes individual lawsuits for breach of fiduciary duty, *Varity Corp. v. Howe*, 516 U.S. 489, 514-15 (1996), "[t]he Supreme Court has . . . limited the applicability of an individual claim for breach of fiduciary duty to those participants who are unable to avail themselves of other remedies."  *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 239 F.3d 51, 58 (1st Cir. 2001); *accord LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002); *Joyce v. John Hancock Fin. Servs., Inc.*, 462 F. Supp. 2d 192, 211 (D. Mass. 2006) (rejecting fiduciary duty claim where plaintiff brought claim for improper denial of benefits).

return to work activity upon an accommodation of her condition. While Dr. Baer stated that "choosing an appropriate work environment and the use of appropriate vision aids with the computer screen" would deal with her subjective symptoms, he did so only after concluding that there were no "restrictions or limitations which would preclude her from performing work activity." (AR at 237). Ultimately, he concluded that "she should be able to return to work activities without substantial limitation or impairment." (*Id.*). Likewise, Dr. Yanik concluded that the vision in plaintiff's left eye "is quite good and would allow her to return to gainful employment within the workplace activity, with the *possible* addition of employer based computer enhancement." (AR at 177 (emphasis added)). Neither physician conditioned their conclusion that she could return to work activity on the existence of accommodations for her condition. Rather, after concluding that she could return to work, they described steps that could be taken to assist plaintiff and minimize her subjective symptoms.[10] Thus, while the possibility of workplace enhancements was considered during the review process and by the administrator in making its decision, Sedgwick did not in fact condition its finding that plaintiff could return to work on the existence of workplace accommodations.

Moreover, and in any event, "[a] claims administrator may properly consider an employer's job requirements, as they are adjusted by reasonable accommodations, in determining whether an employee is totally disabled" from any occupation. *Bekiroglu v. Paul Revere Life Ins. Co.*, 223 F. Supp. 2d 361, 366-367 (D. Mass. 2002) (citing *Ross v. Indiana State Teacher's*

_____

[10] Plaintiff cites a note by a Sedgwick appeals examiner who, after noting that plaintiff was "not found to have any complete visual disability as she is noted to have excellent visual acuity of the left eye," stated "[w]hile she may need adequate workplace enhancements of screen magnifiers and other computer aids, she is not found to be disabled from the ability to sustain gainful occupational employment as of 8/18/06 to the present." (AR at 8-9). This, however, is consistent with Dr. Baer's and Dr. Yanik's reports. The examiner did not state that accommodations were necessary, only that plaintiff *may* need workplace enhancements.

*Assoc. Ins. Trust*, 159 F.3d 1001, 1010 (7th Cir.1998)); *see also Terry v. Bayer Corp.*, 145 F.3d 28, 32, 41 (1st Cir. 1998) (holding that defendant reasonably concluded that plaintiff could return to full-time employment with accommodations where plan defined disability as plaintiff's "complete inability to work in any job for which [he is] reasonably fitted by education, training, or experience"). To give a simple example, suppose a white-collar employee could not read ordinary-sized print without reading glasses—and thus a significant disability (the inability to read) could be accommodated easily (with cheap and readily-available magnifying glasses). Except in highly unusual circumstances, it would be reasonable for a plan administrator to consider that accommodation when deciding whether the employee was "totally disabled" and thus unable to perform any gainful occupation.

Plaintiff cites *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 459-60 (9th Cir. 1996), in support of her position. In *Saffle*, the Ninth Circuit held that a plan administrator acted unreasonably by interpreting plan language that defined total disability as being "completely unable to perform each and every duty of his regular occupation" to mean "'completely unable to perform the duties, *with the accommodations that could have been made*.'" *Id.* (emphasis in original). In addition to being non-binding on this Court, *Saffle* is distinguishable from the facts of this case. The court in *Saffle* was interpreting a clause that defined "disability" as an employee being unable to perform his own occupation. *Id.* at 457. Thus, by considering an accommodation that was essentially outside the realm of Saffle's job, "the administrator evaluated the claimant's employability with a modification of her duties." *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 638 (D. N.J. 2001). This is not an issue when determining whether plaintiff can be employed in *any* occupation. *See Ross v.*

*Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1012 (7th Cir. 1998) (reasoning that the problem in *Saffle* was that administrator "merged impermissibly the occupational and general disability aspects of the plan").[11]

Therefore, even if Sedgwick relied upon the existence of appropriate workplace accommodations in finding plaintiff not totally disabled under the Plan, its decision was not arbitrary or capricious.

### b.     Failure to Investigate Types of Accommodations

Plaintiff next contends that even if Sedgwick acted reasonably in conditioning her lack of disability on workplace accommodations, it acted unreasonably by not adequately investigating the type of accommodations she needed before conducting the TSA. Plaintiff highlights an entry in Sedgwick's internal claim system that requested clarification of the type of visual aids and the type of environment plaintiff needed in order to deal with her subjective complaints as mentioned in Dr. Baer's review. The entry also states that the clarification should be obtained prior to the TSA, as it may be helpful in that analysis. (AR at 21-22).

As an initial matter, as discussed above, Sedgwick did not condition its determination that plaintiff could return to work on the existence of accommodations. Therefore, although more information about the nature of possible accommodations may have been useful in determining what jobs plaintiff could perform, Sedgwick did not act unreasonably in failing to obtain

---

[11] The Court recognizes that *Bekiroglu* relies on *Ross* to support the broader proposition that an administrator can consider reasonable accommodation to determine "whether an employee is totally disabled from *his* occupation." *Bekiroglu*, 223 F. Supp. 2d at 366-367 (emphasis added). Although the First Circuit has held in a manner consistent with this Court's analysis, *see Terry*, 145 F.3d at 41, it has not directly addressed this broader issue. On the facts of this case, this Court need not address whether an administrator can consider reasonable accommodation when addressing an occupational disability provision.

information unnecessary to its decision. *See Downey v. Aetna Life Ins. Co./U.S. Healthcare*, 2003 W L 21135710, at *14-*15 (D. Mass. May 12, 2003) (upholding administrator's decision where reviewing physicians concluded that plaintiff was capable of work and vocational assessment considered plaintiff's medical conditions and identified appropriate occupations).

Furthermore, defendants are not required to conduct a TSA where other evidence, such as the conclusions of reviewing physicians, show that claimant had no more than minor restrictions on her ability to work. *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420-21 (1st Cir. 2000); *see also Caldwell v. Life Ins. Co. of North America*, 287 F.3d 1276, 1289-90 (10th Cir. 2002). Although the reviewing physicians here alluded to possible workplace enhancements, they concluded that plaintiff could return to work activities "without substantial limitation or impairment." Thus, Sedgwick may not have been required to conduct a TSA at all, much less investigate more specific workplace accommodations when doing so. *Cf. Dickerson v. Prudential Life Ins. Co. of America*, 574 F. Supp. 2d 239, 245 -247 (D. Mass. 2008) (defendants did not act unreasonably in identifying other occupations where necessary accommodation was stated only as "wearing protective eyewear"). Regardless, defendants did conduct a TSA. Although the TSA report did not mention workplace accommodations, it specifically considered plaintiff's subjective limitations due to workplace fatigue and the entirety of Dr. Baer's medical review. *See Urso v. Prudential Ins. Co. of America*, 532 F. Supp. 2d 292, 306 (D.N.H. 2008) ("When . . . plaintiff specifically argues [that] his physical limitations prevented him from performing the jobs defendant identified, defendant should . . . consider[] that limitation when analyzing his ability to be gainfully occupied."); *see also Downey*, 2003 WL 21135710, at *14-*15.

Accordingly, defendants did not act unreasonably by not conducting a more thorough investigation into specific workplace accommodations before conducting the TSA.

### c.    Medical Peer Reviews

Plaintiff's contention that defendants' decision was arbitrary and capricious rests principally on the reasonableness of defendants' reliance on the medical peer reviews of Dr. Baer and Dr. Yanik. Plaintiff raises several potential errors in the peer reviews.

### i.    Dr. Yanik's Review

First, plaintiff contends that defendants unreasonably relied on Dr. Yanik's opinion because he ignored objective medical evidence from Dr. Zide, "deferred" to Dr. Baer's report, and relied on the AMA and SSA guidelines for disability.

Plaintiff's first two contentions—that Dr. Yanik ignored medical evidence from Dr. Zide, and deferred to Dr. Baer—are not supported by the record. Dr. Yanik's report indicates that he conducted a review of all of the existing medical evidence, including that which plaintiff submitted on appeal. He also spoke with two of plaintiff's treating physicians—including Dr. Zide—about plaintiff's medical history, her objective and subjective symptoms, and their diagnoses. (*See* AR at 174). His report specifically discusses the objective evidence from Dr. Zide's medical reports, noting that he found plaintiff's left eye to have vision correctable to 20/25, and that her right eye suffered from an inherited disorder from childhood. (AR at 175). Although elements of Dr. Zide's report may have been more friendly to plaintiff's claims, a plan administrator is not required to give special deference to plaintiff's treating physician and does not have "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Furthermore, while Dr. Yanik mentions Dr. Baer's report and its conclusions, he states that the "findings reviewed by Dr. Baer and mine coincide and *are based upon the medical record of Ms. Tebo* as they stand." (AR at 177 (emphasis added)). While it is possible, and perhaps likely, that Dr. Yanik was influenced by Dr. Baer's report, in light of his review as a whole, it was not unreasonable for defendants to rely on Dr. Yanik's medical review.

Dr. Yanik's reference to the AMA and SSA guidelines is more troubling. Plaintiff's disability must be determined according to the terms of the Plan, which may substantively differ from those of the AMA or SSA. *Cf. Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000); *DiGiallonardo v. Saint-Gobain Retirement Income Grp.*, 697 F. Supp. 2d 173, 184 (D. Mass. 2010) (holding administrator's decision arbitrary and capricious when not relying on Plan definition of disability, and that use of SSA definition was an impermissible *post hoc* rationalization). However, a determination of plaintiff's entitlement to social security benefits "can be relevant to an insurer's determination whether that claimant is eligible for disability benefits." *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 215 (1st Cir. 2004).

In reviewing plaintiff's medical evidence, Dr. Yanik concluded that plaintiff is not visually disabled under the AMA and SSA guidelines and stated that plaintiff's subjective complaints do not rise to the level of complete disability under the guidelines. However, as outlined above, this was not the only basis of his opinion that plaintiff was able to return to work. While Dr. Yanik considered the AMA and SSA guidelines, his ultimate conclusion that plaintiff was able to return to work was based upon her medical records and his conversations with her treating physicians. Furthermore, in its letter denying plaintiff's appeal, Sedgwick referred to its initial denial of

plaintiff's claim, the new evidence that plaintiff submitted, and Dr. Yanik's review. Notably, Sedgwick's letter only referred to the portions of Dr. Yanik's review that considered evidence from plaintiff's medical records and treating physicians and did not refer to the AMA and SSA guidelines.

In summary, the Court finds that Sedgwick was not arbitrary or capricious in relying on Dr. Yanik's medical review.

### ii.     Subjective Evidence

Plaintiff next contends that Sedgwick unreasonably relied on the medical reviews because the reviewers did not consider subjective evidence of visual fatigue, pain, and intermittent blurring in determining that she could return to workplace activities. Although subjective symptoms are objectively unverifiable, a plan administrator cannot simply ignore them when determining whether a claimant suffers from an illness. *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 21 (1st Cir. 2003) ("Given the nature of [plaintiff's] disease, it was not reasonable for Liberty to expect her to provide convincing "clinical objective" evidence that she was suffering from CFS."); *Quinlisk v. Unum Life Ins. Co.*, 2009 WL 6506884, at *9 (D. Mass. Sept. 29, 2009); *Pollini v. Raytheon Disability Employee Trust*, 54 F. Supp. 2d 54, 59 (D. Mass. 1999). It is "impermissible to require objective evidence to support claims based on medical conditions that do not lend themselves to objective verification . . . ." *Desrosiers v. Hartford Life & Accident Ins. Co.*, 515 F.3d 87, 93 (1st Cir. 2008). However, an administrator may require objective evidence that the illness rendered the claimant unable to work. *Boardman v. Prudential Ins. Co. of America*, 337 F.3d 9, 17 n.5 (1st Cir. 2003) (noting that "[w]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the

physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis"); *see also Downey v. Aetna Life Ins. Co./U.S. Healthcare*, 2003 W L 21135710, at *14-*15  (D. Mass. May 12, 2003) (finding administrator's denial of benefits not arbitrary and capricious where objective medical evidence suggested plaintiff could work with restrictions despite partial blindness).

The parties do not dispute the existence of plaintiff's medical condition.  However, plaintiff contends that defendants unreasonably discounted her subjective complaints in determining whether she was totally disabled under the Plan.  In support of her position, plaintiff points to several statements in Sedgwick's training materials.  One directs that the reviewer request "objective medical documentation" that the employee "continues to meet the definition of disability," (*See* Pl. Mot. to Supplement AR, Ex. C).  Another describes an independent physician's peer review of a claimant's medical records as allowing the administrator to request "the objective support for [the treating physician's] opinion" of disability and functional capabilities.  (*See* Pl. Mot. to Supplement AR, Ex. D).[12]  Plaintiff also notes that Sedgwick asked Dr. Baer to provide "the objective findings to support" a determination that plaintiff was legally blind, and "the objective evidence to support loss of visual acuity, depth perception, accommodation, and binocular vision," and restrictions due to that impairment. (*Id.* at 248).  And in its questionnaire to Dr. Yanik, Sedgwick specifically asked whether the objective evidence would support a finding that plaintiff was unable to perform job duties.  (AR at 177).

_____

[12] Plaintiff appears to argue that this contradicts the language in the Plan that permits the administrator to have plaintiff "examined by a physician or vocational expert of its choice."  (AR at 422).  However, while the Plan allows an independent medical examination, it does not disallow the administrator from evaluating plaintiff's claim through other methods.  Rather, the Plan grants the administrator broad discretion in how it evaluates claims.  (*See* AR at 420-21).

These statements and questions cannot, however, be read in isolation. The record clearly indicates that Sedgwick did in fact consider plaintiff's subjective complaints in determining whether she could return to work. Both Dr. Baer and Dr. Yanik noted her subjective complaints and concluded that she could return to work "without substantial limitations or impairment." Dr. Baer concluded that there were no restrictions or limitations on her ability to work, but that "choosing an appropriate work environment and the use of appropriate vision aids with the computer screen" would be appropriate to deal with her subjective symptoms. (AR at 237). Dr. Yanik stated that her subjective clinical complaints were important, but "do not rise to the level at which one would consider complete visual disability based upon th[e AMA and SSA] guidelines." (AR at 177).[13] Dr. Yanik also concluded that she could return to work "without substantial limitations or impairment." (*Id.*). Furthermore, as discussed above, the TSA specifically took into account her subjective complaints and Dr. Baer's report.

In summary, the medical reviewers did in fact consider plaintiff's subjective symptoms in evaluating her disability claim, and therefore the decision was not arbitrary or capricious in that respect.

### iii.     Plaintiff's Medical History

Finally, plaintiff contends that Sedgwick's decision was arbitrary and capricious because the medical peer reviews mischaracterized her medical history. Specifically, she notes that both Dr. Baer and Dr. Yanik concluded that she would have no difficulty working one eye because she has had only one working eye since early life. (*See* AR at 174, 237). This contradicts her

---

[13] As discussed above, while plaintiff's eligibility for disability under the AMA and SSA guidelines is not, and should not be, dispositive, it can be relevant in evaluating whether she can return to gainful employment. *Cf. Gannon*, 360 F.3d at 215.

affidavit, in which she contends that she did not lose vision in her right eye until Dr. Rice performed an unsuccessful YAG laser capsulotomy in 2000. (*Id.* at 204). Thus, plaintiff contends, Sedgwick acted unreasonably because it was aware of her affidavit and did nothing to correct the factual assumption of the medical reviewers.

This presents a more difficult issue. Both Dr. Baer and Dr. Yanik relied on the fact that plaintiff had monocular vision from a young age in their medical reviews. Thus, if the record contained medical evidence that plaintiff had lost vision in her right eye in 2000, the defendants likely would have acted unreasonably in not correcting a factual error by the medical reviewers or by relying on their opinion. *See Quinlisk v. Unum Life Ins. Co.*, 2009 WL 6506884, at *8 (D. Mass. Sep. 29, 2009). There is, however, no such medical evidence in the record. Under the terms of the Plan, plaintiff had the burden of submitting information supporting her claim for LTD benefits. (AR at 411, 415). The medical evidence that she submitted, particularly that of Dr. Defrin and Dr. Rice, consistently refers to the problems in plaintiff's right eye as the result of a "congenital condition"—that is, a problem existing from birth. (*See, e.g.*, AR at 5, 44-45, 245, 256-58). Furthermore, Dr. Defrin stated (in a letter accompanying additional medical records that plaintiff submitted in support of her appeal) that when he first examined her in 2000, her vision in her right eye was "blurred" and she had had a visual acuity of 20/400. (AR at 193). Specifically, he stated that "[a] combined hamartoma of the retina and retinal pigment epithelium was present in the right explaining her visual loss. *This is a congenital situation*." (AR at 193 (emphasis added)). Dr. Zide also described her right eye vision loss as "due to congenital factors." (AR at 73). Although it is possible plaintiff lost vision in her right eye at a later age due to congenital factors, she did not provide any medical records from Dr. Rice concerning the visual acuity in her

37

right eye in 2000 or the YAG laser capsulotomy.

Moreover, Dr. Baer spoke with Dr. Defrin, and Dr. Yanik spoke with Dr. Rice, concerning plaintiff's medical history while reviewing her medical records and before reaching their conclusion that she had lost vision in her right eye at a young age. (AR at 173-74, 235-36). Defendants repeatedly provided plaintiff with opportunities to submit additional medical records after they first denied her claim, and again asked her counsel if there were any additional records after she submitted medical evidence in support of her appeal. All that she submitted was her affidavit and medical records from Dr. Defrin and Dr. Zide that stated that the vision loss in her right eye was congenital. (AR at 73, 193).

Plaintiff's statements in the affidavit may raise a genuine issue of fact as to when she lost sight in her right eye, and medical records may exist that would resolve the issue. However, plaintiff did not submit them. Given the substantial evidence in the record, this Court cannot find that defendants acted unreasonably in not giving greater weight to the claims in her affidavit and not "correcting" the medical reviewers. *See Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) ("Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision.").

## IV. <u>Conclusion</u>

For the foregoing reasons, defendants' motion to strike is DENIED; defendants' motion for summary judgment is GRANTED; and plaintiff's motion for summary judgment is DENIED. **So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV

United States District Judge

Dated: January 24, 2012